William BONIN, Petitioner,

v.

Daniel VASQUEZ, et al., Respondents.

No. CV 91–0693–ER.

United States District Court,
C.D. California.

Nov. 9, 1992.

594

Fern M. Laetham, State Public Defender,
Barry Helft, William D. Freeman, Michael

H. Roquemore, Deputy State Public Defenders, San Francisco, CA, for petitioner.

Daniel E. Lungren, Atty. Gen., George Williamson, Asst. Atty. Gen., Gary Schons, Sr. Asst. Atty. Gen., Steven Zeigan, Esteban Hernandez, Deputy Attys. Gen., San Diego, CA, for respondents.

## OPINION AND ORDER ON PETITION FOR WRIT OF HABEAS CORPUS

RAFEEDIE, District Judge.

### I. INTRODUCTION

Petitioner, William George Bonin, has filed a petition for a writ of habeas corpus challenging his 1982 convictions in Los Angeles of ten counts of first degree murder and his subsequent death sentence.[1] After his Los Angeles trial, petitioner stood trial in Orange County where he was convicted of four additional counts of first degree murder and received another death sentence. This order and opinion concerns only the Los Angeles case.[2]

Petitioner has set forth 24 constitutional violations which he believes require the Court to reverse either his convictions, his sentence, or both.

In reviewing this petition, the Court read the entire 5,561 pages of trial transcripts, the clerk's transcripts, the briefs in petitioner's automatic appeal and state habeas, and all of the pleadings and responsive documents filed by both parties. In addition, the Court conducted a three day evidentiary hearing encompassing several of the issues raised in the petition.

The Court has closely examined each issue raised by petitioner. As discussed in detail below, the Court finds that petitioner has not raised any claim which mandates the granting of a writ of habeas corpus.

Accordingly, the Court DENIES Bonin's petition for writ of habeas corpus.

### II. FACTS

Petitioner was convicted in Los Angeles of the murder of ten young males: Marcus Grabs (age 17), Donald Hyden (age 15), David Murillo, Charles Miranda (age 15), James Macabe (age 12), Ronald Gatlin (age 19), Harry Turner (age 14), Steven Wood (age 16), Darin Kendrick (age 19), and Steven Wells (age 18). The string of murders began in August 1979 and continued until June 1980.

All of the victims died from ligature strangulation with the exception of Grabs, who died from multiple stab wounds. Each victim had ligature marks around his neck and either his wrist or ankles, or both. Each victim showed signs of having been beaten around the face and other areas of the body. The evidence disclosed that seven of the victims had engaged in sexual activity prior to their death. With two exceptions, the victims were found nude with no clothing or other identifying evidence in the vicinity.[3]

The prosecution presented three types of evidence. First, the jury heard the testimony of Greg Miley and James Munro, petitioner's former co-defendants.[4] Miley testified that he assisted Bonin in murdering Miranda and Macabe. Munro told the jury that he was present when Bonin murdered Wells. Second, a number of witnesses (a television newscaster, two of petitioner's friends, and two fellow inmates) testified that Bonin admitted killing one or more of the victims. Third, forensic experts linked petitioner to the murders through carpet fibers, hair, semen, and blood.

The defense consisted primarily of discrediting Munro and the inmate witnesses.

---

1. The jury found true the special circumstances of multiple murder and felony murder-robbery, thus making Bonin eligible for a death sentence. The jury acquitted Bonin of two additional counts of murder, as well as one count of sodomy and one count of mayhem.

2. Petitioner filed a petition for writ of habeas corpus in his Orange County case also. That petition was recently denied by this Court. *See* *Bonin v. Vasquez,* 794 F.Supp. 957 (C.D.Cal. 1992).

3. Grabs was nude, but his backpack was found at the scene. Macabe was found fully clothed.

4. Prior to testifying, Miley pled guilty to two counts of first degree murder and Munro pled guilty to one count of second degree murder.

At the penalty phase, the prosecution introduced evidence that Bonin sexually assaulted five young males in the late 1960's and mid–1970's and that he killed four young men in Orange County. The defense presented the testimony of Bonin's mother and two brothers about Bonin's troubled childhood; the testimony of Bonin's friend that Bonin was non-violent; and the testimony of a prison psychologist who discussed Bonin's prison progress. The jury returned a death sentence after less than one day of deliberation.

## III. THE ISSUES

### A. CLAIMS INVOLVING THE ACTIONS OF PETITIONER'S TRIAL COUNSEL

The Court first addresses the common subparts of petitioner's issues two, four, and five.[5] In those three issues, petitioner delineates a host of errors and omissions for which he holds his trial attorney, William Charvet, responsible. In issue two, petitioner argues that Charvet made errors and omissions because of a conflict of interest due to a literary rights agreement. Similarly, in issue four, petitioner attributes the errors and omissions to Charvet's use of drugs during the trial. Finally, in issue five, petitioner suggests that the errors and omissions were a result of Charvet's general ineffective assistance of counsel. Because these errors and omissions constitute the "adverse effect" component of each of the broader issues, the court will discuss each error or admission before discussing the issues of the literary rights agreement, drug usage, and ineffective assistance of counsel.

1) Charvet Failed to Investigate and Obtain a Carpet Fiber Expert to Counter the Testimony of the State's Experts

#### PETITIONER'S CLAIM

■ Petitioner argues that Charvet should have hired a carpet fiber expert to testify that there were an insufficient number of fibers collected from the bodies to be compared with any degree of accuracy with the carpet fibers from petitioner's van.

## DISCUSSION

The Court does not consider Charvet's failure to call a carpet fiber expert to be below the standard of competence expected of an attorney. Given the imprecise nature of fiber analysis, the additional testimony of a carpet fiber expert would add very little. Indeed, each prosecution witness testifying about the carpet fibers acknowledged that the fiber comparisons showed only that there were no dissimilarities between the fibers found on the bodies and the fibers taken from the carpeting in petitioner's van. The witnesses further admitted that they could never prove conclusively the source of the fibers found on the bodies.

Even assuming that Charvet was incompetent for failing to call a carpet fiber expert, the Court finds no prejudice. There is no reasonable probability that the outcome of the trial would have been different had a carpet fiber expert been called to testify that the fiber sample size was too small for a reliable comparison.[6]

2) Charvet Failed to Investigate Mitigating Factors in Petitioner's Childhood As Well As Mitigating Psychiatric Evidence

#### PETITIONER'S CLAIM

Petitioner alleges that Charvet failed to investigating two relevant mitigating factors: petitioner's childhood and petitioner's psychiatric problems. Petitioner maintains that if Charvet had conducted a proper investigation, he would have learned that petitioner was physically abused as a child, was sexually assaulted by a number of adult males, and suffered from a bipolar

---

**5.** These numbers refer to the numbers used by petitioner in his petition. The Court later renumbered the issues to facilitate the grouping of common issues.

**6.** The Court notes that Charvet subsequently offered a carpet fiber expert in the Orange County trial. The expert testified that the fiber sample was too small for an accurate comparison with the van carpet sample. The jury convicted petitioner in Orange County.

mental disorder. Petitioner speculates that the presentation of this information would have humanized him in the eyes of the jury and would have made it reasonably probable that the jury would have opted for a life sentence rather than death.

## DISCUSSION

### Childhood Mitigation

■ The Court finds that Charvet presented a constitutionally adequate portrayal of Bonin's childhood. During the penalty phase, Charvet presented evidence that petitioner's father had a history of abusing alcohol, gambling, and physically assaulting his wife and children. Charvet also presented evidence that petitioner was sexually molested while at a detention center when he was only ten years old. Moreover, after focusing primarily on Bonin's ability to function productively in prison, Charvet stated in his penalty phase closing argument, "I'm not going to go into trying to blame—about the beating of the mother or losing the home—because that's not really part of it. We are talking about what happens. If Mr. Bonin lives, what happens? And why should he die?" [LART 18/5523].

Thus, not only did Charvet present the very evidence that Bonin is complaining Charvet failed to investigate, but Charvet also explained on the record and to the jury that his intent was not to elicit sympathy for petitioner, but rather to show that petitioner could be a functioning member of society if his life was spared.

The Court previously denied petitioner's request for an evidentiary hearing on this issue, but granted the request for an evidentiary hearing on a similar issue in the Orange County case. The Court takes judicial notice of the testimony heard at the evidentiary hearing. The evidence presented at the hearing would have added very little to that which Charvet presented at trial. Through declarations, petitioner presented evidence that several of his class-

mates from fifth and sixth grade recalled that he was always dirty, he related poorly to other children, and he had no friends. A neighbor from childhood remembered that petitioner's parents were rarely around and they never spent time with petitioner and his brothers. Several people who were at the orphanage when Bonin was there vividly described the abusive practices of the orphanage. Of note however, not one declaration named petitioner as either a victim of or a witness to the abuse. In sum, further investigation by Charvet would have revealed little more than that which Charvet did present.

Moreover, Charvet articulated for the jury his tactical reasons for not pursuing childhood mitigation with any more vigor. Charvet decided that his best hope for sparing petitioner's life was to demonstrate that petitioner functioned well in an institutional setting. In hindsight, maybe that was not the best approach. But this Court's role is to examine Charvet's performance at the time it was given. *See Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). Accordingly, this Court finds no constitutional error with Charvet's presentation of the childhood mitigation evidence.

### Psychiatric Evidence

■ The record is clear that Charvet never sought a psychiatric evaluation of petitioner prior to or during the Los Angeles trial. Given the nature of the charges which petitioner faced, as well as post-conviction evidence indicating that petitioner may be suffering from a psychiatric disorder, the Court granted an evidentiary hearing on this issue.

After listening to the expert testimony at the hearing,[7] the Court finds that petitioner has failed to provide persuasive evidence of brain organicity or any other psychiatric or neurological disorder. Dr. Pincus testified that petitioner's history, as well as his neu-

---

**7.** Petitioner presented Dr. Jonathan Pincus, a neurologist, and Dr. David Foster, a psychiatrist specializing in violence and abuse against chil-

dren. Respondent countered with Dr. Park Dietz, a forensic psychiatrist, and Dr. Mark Nuwer, a neurologist.

rological examination,[8] supported a finding of an organic brain disorder. Of significance, petitioner did not demonstrate any correlation between Dr. Pincus' findings, which were obtained in late 1991, and petitioner's mental condition at the time of the murders. Moreover, respondent's experts disputed the findings and conclusions made by Dr. Pincus.

Forced to choose between competing psychiatric and neurological testimony, the Court finds that Drs. Dietz and Nuwer were more credible than Dr. Pincus. The Court cannot help but believe that Dr. Pincus' views on the inappropriateness of the death penalty affect his clinical interpretations in this highly subjective area of medicine.[9]

Finally, the Court is keenly aware that the presentation of psychiatric testimony at the penalty phase would have led to exactly what occurred at the evidentiary hearing— a case of dueling experts canceling out each others testimony. The Court further notes that despite extensive pre-hearing briefing alleging that petitioner suffers from a bipolar psychiatric disorder, petitioner abandoned this argument at the hearing and focused instead on a theory of organic brain disorder, thus demonstrating the fluid nature of psychiatric testimony.

The Court concludes that Bonin was not prejudiced by Charvet's failure to present psychiatric evidence. It is not reasonably likely that had the jury heard the type of testimony presented at the evidentiary hearing, the jury would have returned a life verdict. Because petitioner failed to demonstrate prejudice, the Court need not examine the propriety of Charvet's failure to conduct a psychiatric investigation. *See*

*Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069.

3) Charvet Called James Munro as a Defense Witness and Failed to Edit a Tape Played to the Jury of Munro's Interrogation in Which an Uncharged Murder is Attributed to Petitioner

### PETITIONER'S CLAIM

Petitioner argues that the testimony of James Munro, his former co-defendant, was the most damaging evidence against him. By calling Munro as a defense witness, Charvet wrongly bolstered Munro's credibility in the eyes of the jury. As for the tape, petitioner says nothing other than that Charvet failed to edit the tape.[10]

### DISCUSSION

■ Without a doubt, Munro's testimony about the Wells murder was a key piece of evidence against Bonin. Munro, however, was a witness with a history of lying and manipulation. Charvet called Munro as a defense witness to place before the jury more evidence of Munro's lies and manipulations. The transcript of Munro's testimony shows that Munro, as a defense witness, once again demonstrated his inability to be truthful and candid. Of importance, Munro did not testify about the details of the Wells murder while he was a witness for the defense. [LART 15/4411–4419].

With little else upon which to build a defense, Charvet cannot be faulted for trying to discredit a crucial witness. Certainly this is a tactical decision that falls within the realm of effective trial advocacy. In any event, even if it was poor lawyering,

---

**8.** Dr. Pincus told the Court that he found two significant neurological findings while examining petitioner: the presence of a snout reflex and a positive right Babinski. Dr. Pincus described a snout reflex as a pursing of the lips when one is tapped around the mouth. A Babinski sign occurs when a person's toes fan out upon stimulation of the sole of the foot. According to Dr. Pincus, these two signs together indicate bilateral frontal brain dysfunction with heavier damage on the left side.

**9.** Dr. Pincus testified that he has examined approximately 20 death row inmates in the past

five years. Though Dr. Pincus denied any philosophical opposition to the death penalty, he stated a firm belief that life without the possibility of parole is the appropriate sentence whenever *any* mitigating evidence is presented, no matter how heinous the crime.

**10.** The claim is worded so as to imply that the unedited tape was part of Munro's defense testimony. That is not true, however. The tape was played during Charvet's cross-examination of Munro during the prosecution's case-in-chief.

Bonin has offered nothing to support a finding of prejudice.

■ As for the tape, Charvet described his tactical reasons for playing the tape.[11] Moreover, petitioner concurred with the decision to play the unedited tape. Charvet's actions with regard to the tape were neither ineffective, nor prejudicial.

4) Charvet Failed to Object to Lloyd Carlo Douglas' Testimony that He and Petitioner Engaged in Oral Sex Between the Bars of Douglas' Jail Cell and Charvet Elicited Damaging Statements From Douglas During Cross–Examination

### PETITIONER'S CLAIM

Petitioner does not articulate the nature of his claim with much detail. Presumably, he finds fault with Charvet's failure to object to the testimony about oral sex because the testimony was prejudicial. Regarding Charvet's cross-examination of Douglas, petitioner says that Charvet elicited sensational and extremely damaging statements from Douglas. These statements were the only evidence that Bonin cut off penises, tied two victims together, stuck a dildo into one boy's rectum, bit through one victim's penis and chewed off the nipple of another victim. Also, Charvet elicited the only testimony that Douglas needed to be in protective custody after testifying against petitioner and that petitioner said they have not found all of the bodies and they never will.

### DISCUSSION

■ Setting aside the question of whether Charvet's actions vis-a-vis Douglas' testimony were wrong, it is clear that petitioner suffered no prejudice. It cannot fairly be said that the jury might have returned a different verdict had Douglas not testified about his sexual relationship with petitioner. The Court finds it highly improbable that petitioner's sexual habits in jail had any impact on the determination of his guilt or innocence of twelve counts of first degree murder. In addition, when viewed in the context of the atrocities petitioner was accused of committing, testimony about oral sex in prison is hardly prejudicial. In fact, Charvet used the testimony about the oral sex to discredit Douglas during his closing argument. Charvet asked the jury to consider the probability of petitioner repeatedly orally copulating Douglas through the food slot of Douglas' cell in the hallway of the guarded high-security module without ever being caught. Charvet implied that if Douglas could make up that story, then how could the rest of his testimony be believed.

■ As for the "prejudicial" statements elicited by Charvet on cross-examination, it is apparent that the jury did not find Douglas' testimony to be credible. Many of the acts Douglas attributed to petitioner involved mutilation. The testimony of the pathologists who performed the autopsies on the bodies refuted any argument that the victims, in general, were stabbed, cut, or mutilated in the manner described by Douglas. There was testimony that one victim, Thomas Lundgren had his penis cut off. The jury, however, acquitted petitioner of Lundgren's murder, a clear sign that the jury did not believe Douglas.

Regardless of the correctness of Charvet's cross-examination strategy, it is not reasonably likely that the outcome of the

---

11. Prior to the playing of the tape, the prosecutor, at sidebar, asked Charvet if he was aware that in the tape the police ask Munro about another body found behind a gas station. During the questioning, the police tell Munro that they know Bonin committed the second murder and they think Munro assisted. The prosecutor reminded Charvet that Bonin was not charged with the second murder. Charvet responded that he was aware of that and had discussed it with his client:

For the record, I have talked to my client again and we have been over this once before. He feels it is more advantageous to have the whole tape played because of the fact that Mr. Munro did work in a Mobil gas station. My client is not charged with that killing which I can argue to the jury. I went through all of the ramifications and he said he wants to have the tape played. I concur as a trial tactic. I think it gives me an argument to the jury by saying if the police had him, they would have charged him. It gives me another shot at Munro.

[LART 12/3417].

trial would have been different without the statements elicited by Charvet. As one court noted, "A wrong question, or a series of them, in a criminal trial would seldom be considered as decisive elements of ineffective assistance." *Lane v. Le Fevre*, 705 F.Supp. 88, 95 (N.D.N.Y.1989), *aff'd without op.*, 891 F.2d 277 (2d Cir.1989). This Court agrees.

5) Charvet Failed to Object to David Lopez' Testimony That Petitioner Admitted to Him That He Killed 21 Victims

PETITIONER'S CLAIM

■ Petitioner finds error with Charvet's failure to object to portions of David Lopez' testimony where Lopez stated that petitioner admitted killing 21 victims.[12]

DISCUSSION

To sustain an ineffective assistance of counsel claim, petitioner must demonstrate not only that counsel's performance was severely deficient, but also that absent the deficiency, there is a reasonable likelihood that the outcome of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Petitioner cannot meet this second requirement.

Petitioner concedes, as he must, that the prosecution was entitled to elicit Lopez' testimony concerning Bonin's admission to killing 11 of the 12 victims for whom Bonin was standing trial.[13] [Petitioner's Supplemental Brief, filed July 26, 1991, p. 2.] Therefore, even if Charvet had objected to the testimony about 21 murders, and the objection was sustained, the jury would still have learned that Bonin confessed to murdering 11 of the victims. With that kind of evidence properly before the jury, as well as the other admissible evidence strongly indicative of Bonin's guilt, it cannot reasonably be argued that if Charvet had objected to the testimony about the 21 murders, petitioner would not have been convicted of 10 counts of murder. Lopez'

testimony was extremely damaging to petitioner's case, but the damage was due to petitioner's admissions to Lopez, not to Lopez testifying about 21 murders instead of 11 murders.

As to the soundness of Charvet's decision not to object, the Court need not resolve that question since the Court found no prejudice. *See Strickland*, 466 U.S. at 697, 104 S.Ct. at 2070. However, as respondent observed, Charvet used Lopez' testimony in an attempt to discredit him. Charvet questioned the truthfulness of Lopez' testimony since the prosecution charged petitioner with only 12 murders, not 21. Since Lopez' testimony was going to be devastating in any event, Charvet may have opted to take the one course of action that could potentially lessen the impact of the testimony. Therefore, the Court is of the opinion that the failure to object was not an error of constitutional magnitude.

6) Charvet Failed to Object to the Prosecutor Referring to 16 Victims in His Opening Statement and Continually Referring to 21 and 22 Victims in His Closing Statement

PETITIONER'S CLAIM

■ Petitioner takes issue with Charvet's failure to object to the prosecutor talking about 16 victims in his opening statement. Petitioner also takes exception to the prosecutor's frequent reference to 21 and 22 victims in his closing statement.

DISCUSSION

To prevail on this issue, petitioner must rebut the presumption that Charvet's failure to object to the prosecutor's arguments was "sound trial strategy." *Paradis v. Arave*, 954 F.2d 1483, 1494 (9th Cir.1992). In assessing petitioner's claim, this Court need not determine why Charvet failed to object, "as long as his failure to do so falls within the range of reasonable representa-

---

**12.** Despite Lopez mentioning 21 victims several times, petitioner references only one page of the transcript (4537), where Lopez first mentioned the list of 21 names.

**13.** Petitioner denied killing Lundgren and was eventually acquitted of that murder.

tion." *Morris v. California,* 966 F.2d 448, 456–457 (9th Cir.1992).

Petitioner has not rebutted the presumption that there existed a tactical reason for Charvet not to object. As previously discussed, Charvet attempted to use Lopez' testimony about 21 murders to petitioner's advantage. Charvet questioned why petitioner was facing only 12 murder counts if Lopez was so reliable. Charvet's theory would have been severely undermined if had later objected to the prosecutor's reference to Lopez' testimony about 21 murders.

In any event, petitioner cannot demonstrate prejudice. The prosecutor mentioned 16 murders when referring to Douglas' testimony and 21 or 22 murders when discussing Lopez' testimony. Both Douglas and Lopez had a right to talk about petitioner's admissions to murdering 11 of the 12 victims. There is no reasonable likelihood that the verdicts would have been different if the number 11 had been substituted in place of 16, 21, and 22 in the prosecutor's arguments.

### 7) Charvet Elicited Negative and Damaging Testimony about Bonin From Prosecution Witnesses

#### PETITIONER'S CLAIM

 Petitioner believes that Charvet harmed his defense by eliciting negative and damaging information about him from prosecution witnesses. Petitioner specifically refers to three incidents: 1) Charvet induced a detective to describe Grabs' assailant as like "a rabid dog that has gone insane;" 2) Charvet caused petitioner's friend Fraser to testify that petitioner said he did not go to the police about the "self-defense" killing of Grabs because "with my past? I would go right to jail.... No way I am going back to jail;" 3) Charvet prompted Gustin to recall that petitioner told him that he had killed someone.

#### DISCUSSION

While Charvet's questions may have been ill-advised, the answers did not prejudice petitioner. Grabs was stabbed over 70

times. The jury knew that. The detective's description of the assailant was a reasonable characterization. Moreover, Charvet used the rabid dog remark to argue to the jury that there was no similarity between the Grabs murder and the other murders. As for Fraser's remarks, the jury was not given any other information during the guilt phase about petitioner's prior incarcerations. There is no reasonable likelihood that the jury would have returned different verdicts had it not learned that petitioner had been in jail previously. Finally, Charvet did not elicit any details from Gustin about petitioner's admission that he killed someone. There cannot be any prejudice from that admission because Fraser, Pendleton, and Lopez each testified that petitioner had admitted killing at least one person.

Issue One: [14] THE CONFLICT OF INTEREST BETWEEN PETITIONER AND HIS COUNSEL RESULTING FROM A LITERARY RIGHTS RETAINER AGREEMENT ADVERSELY AFFECTED COUNSEL'S PERFORMANCE AND DENIED PETITIONER THE EFFECTIVE ASSISTANCE OF COUNSEL

#### PETITIONER'S CLAIM

Petitioner alleges that he retained Charvet as counsel in exchange for a literary rights agreement which gave Charvet a percentage interest in the proceeds from a book to be written about petitioner's life. Petitioner now claims that this agreement caused Charvet to labor under a conflict of interest, torn between his duty to represent petitioner and his desire to maximize his profit from the book. Petitioner asserts that he was unaware of the dangers in being represented by an attorney who was a party to a literary rights agreement.

Petitioner further alleges that as a result of the conflict from the literary rights agreement, Charvet made all of the errors and omissions discussed above.

#### THE LAW

 To obtain a reversal based on a conflict of interest, a defendant such as

---

**14.** As noted earlier, the issues are now numbered to correspond to the Court's grouping of issues, rather than petitioner's numbering system.

petitioner who did not object at trial, must prove that his attorney labored under an actual conflict that adversely affected his performance. *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980).

## DISCUSSION

Petitioner sought an evidentiary hearing on this issue. The Court denied the request because petitioner failed to allege any valid adverse affect. For this same reason, the Court now denies this claim.

To prevail on this issue, petitioner needed to make two showings: one, that there was a literary rights agreement between him and Charvet, and two, that Charvet's performance was adversely affected by the conflict. In support of the second requirement, petitioner set forth seven allegations of adverse affects due to the book agreement. As discussed in detail above, the Court has found that each of the incidents of "adverse affect" was without merit. Accordingly, petitioner has failed to satisfy the second *Cuyler* requirement needed for reversal.

In addition, despite the denial of an evidentiary hearing on this issue in this case, the Court did hear evidence on the issue of a literary rights agreement as it affected the Orange County case. The Court takes judicial notice that in *Bonin v. Vasquez,* Case No. CV 90-3589-ER, the Court found insufficient factual support for petitioner's argument that he and Charvet had a literary rights agreement. *See Bonin v. Vasquez,* 794 F.Supp. 957 (C.D.Cal.1992). Thus, petitioner has also failed to satisfy the first *Cuyler* requirement.

Issue Two: CHARVET'S CHRONIC DRUG ADDICTION AND DRUG USE SO AFFECTED HIS ABILITY TO PERFORM AS A REASONABLY COMPETENT COUNSEL THAT PETITIONER WAS DENIED THE ASSISTANCE OF COUNSEL

### PETITIONER'S CLAIM

Petitioner contends that at the time of his trial, Charvet was addicted to prescription pain medications that affected his judgment and his ability to perform his duties. The most notable effect of Charvet's drug usage was using poor judgment to take the case in the first place without sufficient preparation time. As a consequence of Charvet's drug addiction and resulting lack of judgment, Charvet made the errors and omissions set forth above. Charvet's drug usage caused him to render ineffective assistance of counsel.

## THE LAW

To succeed on an ineffective assistance of counsel claim premised on an attorney's use of alcohol or drugs, a petitioner must demonstrate that the attorney's performance was deficient and that the deficiency prejudiced the petitioner. *See e.g. Berry v. King,* 765 F.2d 451, 454 (5th Cir. 1985), *cert. denied,* 476 U.S. 1164, 106 S.Ct. 2290, 90 L.Ed.2d 731 (1986); *McDougall v. Dixon,* 921 F.2d 518 (4th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 2840, 115 L.Ed.2d 1009 (1991); *Hernandez v. Wainwright,* 634 F.Supp. 241, 245 (S.D.Fla.1986), *aff'd without op.,* 813 F.2d 409 (11th Cir. 1987).

## DISCUSSION

The Court discussed and rejected each of petitioner's claims of adverse effect or deficiency of performance. Accordingly, petitioner has failed to show the Court that he was prejudiced by Charvet's actions. Since petitioner has not demonstrated a necessary component of an ineffective assistance of counsel claim, the Court need not inquire into the allegations that Charvet used drugs while representing petitioner.

Issue Three: CHARVET'S REPRESENTATION OF PETITIONER WAS CONSTITUTIONALLY INADEQUATE

### PETITIONER'S CLAIM

Petitioner maintains that Charvet provided ineffective assistance of counsel in violation of the Sixth Amendment. In support

of his claim, petition cites the errors and omissions discussed in detail above.

## THE LAW

■ An ineffective assistance of counsel analysis has two components: 1) was counsel's performance deficient; and 2) did the deficient performance prejudice the defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). In a capital case, this analysis applies both to the guilt phase and the penalty phase. *Id.* at 687–88, 104 S.Ct. at 2064.

■ An attorney's performance is deficient if it "fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2065. This requires a showing that the attorney's errors were so serious that the defendant was denied the "counsel" guaranteed by the Sixth Amendment. *Id.* at 687, 104 S.Ct. at 2064. "A court must indulge a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.*

Even if an attorney commits serious error, it will not result in reversal if the error had no effect on the judgment of the case. *Id.* at 691, 104 S.Ct. at 2066. To prove prejudice, a defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. A reasonable probability is one that undermines confidence in the outcome. *Id.*

## DISCUSSION

The Court has found no merit to petitioner's claims regarding Charvet's errors and omissions. Therefore, the Court finds that Charvet's representation of Bonin was constitutionally adequate.

## B. CLAIMS INVOLVING CHARVET'S SUBSTITUTION AS COUNSEL

### BACKGROUND

A number of petitioner's claims involve how William Charvet came to represent petitioner. Accordingly, the Court provides the following detailed account of the facts leading to Charvet's substitution as petitioner's attorney:

The trial court formally appointed Earl Hanson to represent petitioner on January 2, 1981.[15] [LART A/2]. Five days later, the court set a trial date of May 4, 1981. [LART A/7]. On March 30, 1981, Hanson asked that the trial be continued until August 1, 1981. [LART A/25]. The prosecution opposed the continuance arguing that there were 150–200 witnesses subpoenaed for the case and it was difficult to control the witnesses when the dates change. [LART A-26]. The court granted the continuance. [LART A/28].

On July 29, 1981, Hanson sought another continuance until mid-September 1981. [LART A/63]. The prosecution again objected citing difficulties with coordinating the large number of witnesses. [LART A/64]. The court moved the trial date to September 14, 1981. [LART A-66].

On September 3, 1981, petitioner asked the court to substitute Charvet for Hanson. Charvet told the court that he would need a substantial continuance if he took the case because of the number of documents and charges involved. [LART A-103]. The prosecutor said he opposed any substitution and continuance because of prejudice to the prosecution's case and because of two possible conflicts of interest involving Charvet. [LART A/104–105]. The judge continued the motion until September 14, 1981 so that the judge who heard the previous continuance motions could be present. [LART A/104].

On September 14, 1981, Hanson informed the court that he was ready to proceed with trial, but that petitioner wished to substitute Charvet as his attorney. [LART

---

**15.** Apparently, Hanson had been representing Bonin for a considerable period of time prior to the formal appointment.

A/109]. Charvet related that he and petitioner had discussed Charvet's representation four or five months earlier, but Charvet had to see how well he recovered from spinal surgery performed in June 1981. [LART A–109–110]. Charvet also told the court that he would need a 120–day continuance because of the file cabinets full of documents and the 12 special circumstance murder counts. [LART A–11].

The prosecutor vehemently objected citing three major concerns. First, he expressed concern about the effect of more continuances on the prosecution's case. He argued that he had been prepared since May 4, the original trial date, and that over one hundred witnesses were under subpoena in anticipation of the September 14 trial date. *Id.* Moreover, the case had been continued twice over his objections. [LART A/112]. Hanson had fourteen months to prepare and was ready to proceed with trial. *Id.* The prosecutor suggested that petitioner was using a dilatory tactic since petitioner never expressed a desire for new counsel until September 3, 1981. *Id.* He also opined that petitioner's delays would further damage the prosecution's case because petitioner had already attempted to influence Munro's testimony. [LART A/113]. He feared that any further delay could erode Munro's testimony. *Id.* He also told the court that further delay might cause Orange County to prosecute first, thus causing an even lengthier delay in the case. [LART A/114]. To bolster his argument, the prosecutor played a tape-recording made of petitioner's phone call to some friends. On the tape, petitioner said that if the court did not grant his substitution, he would seek *pro per* status and get a six-month continuance and then get another lawyer. [LART A/129].

Next, the prosecutor informed the court that Charvet had prior contact with Munro, a key prosecution witness. [LART A/115]. According to the prosecutor, Charvet and Munro previously discussed the possibility of Charvet representing Munro, who was facing a murder charge in the death of Wells. *Id.* The prosecutor argued that Charvet's representation of petitioner would create an impermissible conflict of interest since Munro would be a chief witness against Bonin. Charvet vehemently denied this charge. He acknowledged that he and/or his associate visited Munro on a couple of occasions and that he appeared at Munro's preliminary hearing [LART A/117–118], but maintained that he and his associate were merely sounding boards for Munro's numerous gripes. [LART A/119–120]. Indeed, Charvet declared, "but as far as conflict of interest, I have nothing I can cross-examine Mr. Munro on, any facts contrary that is not in the public record, that he has ever given me as a private attorney." *Id.*

Finally, the prosecutor questioned whether Bonin and Charvet included a literary rights agreement as part of Charvet's retainer agreement since Bonin had previously told the court that he could not afford retained counsel. The court invited Charvet to respond to the question about a book agreement. Charvet responded in an equivocal manner:

> [The prosecutor] has no right to go into my fee arrangement with this client.... I would feel very confident from the U.S. Supreme Court stating the following: that if a person's only asset that he had in the whole world was a book right to get an attorney of his choice—let's use this hypothesis—as long as the defendant himself did not benefit in any other way and saved the state and the county, and everyone else the money and he had the attorney of his choice then I think they would even allow that ....

[LART 1/A–123–24].

The court sought Hanson's views on the substitution motion. Hanson said that petitioner never wanted him as his attorney and opined that petitioner was not being dilatory, but instead attempting to get counsel of his choice since he was facing a possible death sentence. [LART A/132]. Hanson also agreed that a continuance of 90–120 days, or even less, would be sufficient preparation time for Charvet. [LART A/133].

Petitioner told the court that his relationship with Hanson had been good, but that

due to personal vibes he could not discuss certain subjects with Hanson. [LART A/134–135].

At the conclusion of the hearing, the court made the following statements:

[T]o walk into court on the day of trial after fourteen months of preparation and then ask this court for a further continuance, ninety or 120 days or beyond that is an unreasonable disruption of the judicial process. I think the statements made here by [the prosecutor] are correct. [T]he people have a right to a speedy trial, and by granting a further delay in this matter of any substantial nature is going to substantially hurt the people's case, and I make that finding. [LART A/135].

[I] am deeply concerned with the fact that I think that this is a ploy by this defendant based upon what I have heard at this hearing, to delay this matter going to trial and I'm satisfied that if a continuance was granted through further efforts by this defendant that further delays would be sought and that the ends of justice would further be thwarted by his effort of substituting an attorney fourteen months later on the date of the trial. [LART A/138].

The court also found that Charvet had a conflict due to his prior contact with Munro. *Id.* The court put the matter over until September 21, 1981. [LART A/136]. Before the hearing ended, petitioner requested to go *pro per* if Charvet could not be his attorney. [LART A/140]. The judge put that matter over one week also, but cautioned that if he granted the motion, it would be without any continuance.

On September 21, 1981, Charvet informed the court that the appellate court had denied his Writ of Mandate concerning the denial of substitution. [LART A/141]. Charvet stated that he intended to pursue the issue with the California Supreme Court. [LART A/142]. The court granted a continuance until October 19, 1981. [LART A/145]. The judge said the trial would start on that date in one of three ways: with Charvet as counsel if he was prepared and petitioner wanted him; with Hanson as attorney; or with petitioner representing himself and Hanson acting as advisory counsel. [LART A/145–146]. Charvet questioned how he could be the attorney given the judge's finding of a conflict. [LART A/147]. The judge never gave Charvet a direct answer.

On October 19, 1981, Charvet announced that he was prepared to go to trial. [LART 1/2]. The judge granted the substitution. *Id.* The following colloquy took place:

Charvet: [M]r. Bonin is here, and he understands, and I want him to be asked that he understands, that I've only had a little over one month to prepare. Mr. Hanson and himself assisted me for a full month in his pro per status, and that I'm not as comfortable with one month as I would have been with two or three.... I'd like the court to ask him on the record that he does understand that and still does agree under that—

Court: Well, he previously indicated to me that he wants you as the attorney of record. And that is your frame of mind, is that right, Mr. Bonin?

Bonin: That's correct.

[LART 1/4].

Jury selection began that day with Charvet as counsel.

**Issue Four:** THE TRIAL COURT KNEW OR SHOULD HAVE KNOWN THAT THERE WAS A CONFLICT OF INTEREST BETWEEN PETITIONER AND HIS COUNSEL RESULTING FROM A LITERARY RIGHTS RETAINER AGREEMENT AND SHOULD HAVE REFUSED TO ALLOW SUBSTITUTION OF COUNSEL ABSENT A WAIVER

PETITIONER'S CLAIM

Petitioner contends that the trial court had sufficient reason to know or suspect that he was compensating Charvet for his attorney services through a literary rights agreement. Accordingly, the court should have inquired about the agreement and then either prevented Charvet from substituting as Bonin's counsel or obtained a

knowing, intelligent, and voluntary waiver of a conflict of interest from petitioner. The court neither inquired, nor secured a waiver. As a result, petitioner went to trial unaware of the dangers of having an attorney burdened by a conflict of interest. This violated petitioner's right to the effective assistance of counsel, to a reliable death judgment, and to due process.

## THE LAW

The Sixth Amendment encompasses not only the right to an attorney, but the right to an attorney who is not burdened with a conflict of interest. *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). To give meaning to such a right, the trial court has a duty "to recognize the possibility of a disqualifying conflict of interest." *Wood v. Georgia*, 450 U.S. 261, 272, 101 S.Ct. 1097, 1104, 67 L.Ed.2d 220 (1981). When the possibility of a conflict is sufficiently apparent to the court, the court has an obligation to inquire into the conflict. *Id.*

In *Wood*, the Court found the possibility of a conflict to be so obvious that it raised and decided the issue *sua sponte*. The conflict in *Wood* involved an attorney simultaneously representing both the employees of an adult bookstore and the owner of the bookstore. The employees had been convicted of distributing obscene material and sentenced to hefty fines and probation. When the employees failed to pay the fines, the court revoked their probation. The employees told the court that they could not afford the fines and that they

had been led to believe that the owner would pay their criminal fines. Indeed, the owner had paid for other costs associated with the employee's legal problems. The record strongly suggested that the owner had no intention of paying these particular fines, however, hoping instead to use the case to raise a constitutional challenge. During the hearing on the employee's probation revocation, the state explicitly raised the conflict issue to no avail.

On these facts, the Court determined that the trial court should have further explored the attorney's dual representation. To remedy the due process violation, the Court remanded the case to the trial court for a hearing to determine whether an actual conflict of interest existed.

## DISCUSSION

Taking its lead from the *Wood* court, if this Court were to find that the trial court should have made further inquiry, than the Court would hold a hearing to determine whether an actual conflict of interest existed at the time Charvet became counsel for Bonin.[16]

The Court notes that petitioner did not seek an evidentiary hearing on this particular *Wood* issue. However, petitioner did seek an evidentiary hearing on claims of ineffective assistance of counsel related to the literary rights agreement in both this case and the Orange County case. The Court denied the evidentiary hearing in this case because petitioner's claims related to adverse effect were found to be without merit. On the other hand, the Court heard

---

**16.** Petitioner submits that the *Wood* case calls for a mandatory reversal and not just a hearing to determine whether an actual conflict of interest existed. In support of this argument, petitioner cites the alluring language of a footnote in *Wood*:

> Justice White's dissent states that we have gone beyond the recent decision in *Cuyler v. Sullivan*, 446 U.S. 335 [100 S.Ct. 1708, 64 L.Ed.2d 333] ... (1980). Yet nothing in that case rules out the raising of a conflict-of-interest problem that is apparent in the record. Moreover, *Sullivan mandates* a reversal when the trial court has failed to make an inquiry even though it "knows or reasonably should know that a particular conflict exists." *Id.* at 347 [100 S.Ct. at 1717]....

*Wood,* 450 U.S. at 272 n. 18, 101 S.Ct. at 1104 (emphasis in original).

Despite the language of the footnote, the *Wood* court vacated and remanded for a hearing. The Court did not summarily reverse the convictions.

The Court finds that the proper reading of *Wood* is that reversal is mandated only if an actual conflict of interest is found. If the conflict cannot be determined without a hearing, then a hearing must be held. This interpretation of *Wood* has support in other jurisdictions. *See Brien v. United States,* 695 F.2d 10, 15 n. 10 (1st Cir.1982); *United States v. Winkle,* 722 F.2d 605, 611–612 (10th Cir.1983).

extensive testimony concerning the existence of a literary rights agreement in the Orange County case.

The Court takes judicial notice that in *Bonin v. Vasquez*, 794 F.Supp. 957, this Court found insufficient factual support for petitioner's argument that he and Charvet had a literary rights agreement. Accordingly, the Court finds no reason to resolve the *Wood* question since the Court has already determined that Charvet did not have an actual conflict of interest due to a literary rights agreement.

Issue Five: THE CONFLICT OF INTEREST BETWEEN PETITIONER AND HIS COUNSEL RESULTING FROM COUNSEL'S PRIOR ATTORNEY–CLIENT RELATIONSHIP WITH THE CHIEF PROSECUTION WITNESS MUNRO DENIED PETITIONER THE EFFECTIVE ASSISTANCE OF COUNSEL

### PETITIONER'S CLAIM

Petitioner argues that Charvet suffered from an actual conflict of interest because he had a prior attorney-client relationship with James Munro, a key prosecution witness. Petitioner submits that he was never informed of the dangers inherent in being represented by an attorney burdened by a conflict, nor did he ever waive the conflict.

### THE LAW

The criteria needed to establish a Sixth Amendment violation due to an attorney's prior relationship with a key prosecution witness are the same as that needed to prove a conflict due to a literary rights agreement. A defendant who did not object to a possible conflict at trial must demonstrate that an actual conflict adversely affected his lawyer's performance. *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980). The defendant need not prove prejudice. *Id.* at 349, 100 S.Ct. at 1718.

### BACKGROUND

As discussed above, the trial court expressly found that Charvet's representation of petitioner would pose a conflict of interest due to Charvet's prior contact with Munro. Notwithstanding this finding, the trial court allowed Charvet to become counsel for petitioner.

Naturally, as the prosecutor predicted [LART A/116], petitioner seized upon this on appeal claiming that his conviction should be reversed due to the conflict. When faced with this issue in Bonin's direct appeal, the California Supreme Court held that petitioner failed to demonstrate any adverse effect from the conflict. *People v. Bonin*, 47 Cal.3d 808, 254 Cal.Rptr. 298, 318, 765 P.2d 460, 479 (1989). Charvet, the court observed, conducted a "broad and deep" cross-examination of Munro. *Id.* The court could neither find, nor conjure up, any error on Charvet's part which could be attributed to his earlier discussions with Munro. *Id.*

### DISCUSSION

Having thoroughly reviewed Charvet's cross-examination of Munro, the Court agrees with the assessment of the California Supreme Court. Charvet's questions covered a gamut of possibilities. For example, Charvet pointedly asked Munro whether it was true that he killed Wells. [LART 10/3067]. After Munro denied this, Charvet elicited Munro's admission that he was present during the murder. [LART 10/3068]. Charvet went on to explore Munro's numerous inconsistencies related to his role in the murder. Later, Munro admitted that he agreed with Bonin when Bonin asked him if he wanted to pick up a hitchhiker, have sex with him, and kill him. [LART 10/3088]. Charvet altered the scenario a bit by asking Munro if he assisted Bonin in killing Wells or whether Bonin killed Wells alone. [LART 10/3089]. Munro replied that he held Wells' feet while Bonin killed Wells.

In sum, Charvet questioned Munro about the three obvious situations: Munro killed Wells alone, Bonin killed Wells alone, and Bonin and Munro killed Wells together. In addition, Charvet *repeatedly* attacked Munro's credibility by highlighting his lies, emphasizing his inconsistencies, and noting his incentives to testify against Bonin.

The Court cannot fathom what Charvet may have failed to do as a result of his previous conversations with Munro. Moreover, petitioner has not supplied the Court with any evidence that Charvet's conversations with Munro had any effect, let alone any adverse effect, on Charvet's conduct of the trial. Accordingly, there can be no relief on this claim.

Issue Six: PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN THE TRIAL COURT ACCEPTED SUBSTITUTION OF COUNSEL, BUT REFUSED A REASONABLE CONTINUANCE TO PREPARE

### PETITIONER'S CLAIM

Petitioner appears to make two separate claims relating to the start of his trial. First, he argues that he was deprived of the effective assistance of counsel because Charvet took the case without sufficient time to prepare. Second, petitioner claims that the trial court's denial of a continuance violated his right to due process.

### THE LAW

■■■■■ The Court reviews the denial of a continuance for abuse of discretion. *See Armant v. Marquez*, 772 F.2d 552, 556 (9th Cir.1985), *cert. denied*, 475 U.S. 1099, 106 S.Ct. 1502, 89 L.Ed.2d 902 (1986). No abuse of discretion will be found unless the reviewing court determines that the denial was arbitrary or unreasonable. *See United States v. Flynt*, 756 F.2d 1352, 1358 (9th Cir.1985). In making its review, the court must focus on the circumstances of the particular case at issue. *Id.* Four factors are particularly relevant to the inquiry: 1) the diligence of the defendant prior to seeking a continuance; 2) whether the continuance would have served a useful purpose; 3) whether the continuance would inconvenience the court or the prosecution; and 4) the prejudice suffered by defendant due to the denial. *See Armant*, 772 F.2d at 556–557. While there is no magic formula for weighing the factors, petitioner must show at least some prejudice from the denial. *Id.*

### DISCUSSION

■■■■■ At the outset, the court notes that neither petitioner nor Charvet formally requested a continuance on October 19, 1981, the day the trial began. There was talk on September 14, 1981 about requesting a continuance and an implied denial by the court. On the day Charvet accepted appointment however, he did not move for a continuance. Nevertheless, for completeness, the Court will analyze this issue as if petitioner had a sought continuance on the date his trial began.

### Defendant's Diligence

A review of the record shows that petitioner demonstrated not diligence, but rather a desire to postpone his trial. Indeed, the court expressly found that petitioner's actions were dilatory in nature. Moreover, petitioner expressly requested Charvet's services despite a warning that Charvet felt he would be better prepared if he had more time.

### Useful Purpose

The continuance would have allowed Charvet more time to prepare for petitioner's extensive murder trial. On the other hand, petitioner had an attorney, Hanson, who worked on the case for over a year and was fully prepared to proceed with the trial.

### Inconvenience

A further continuance would have greatly inconvenienced, if not harmed, the prosecution. The trial had already been continued twice. Each change necessitated the rescheduling of over one hundred subpoenaed witnesses. Plus, as in any case, memories fade over time. In addition, Orange County could have jumped into the void and tried petitioner first, thus creating an even lengthier delay.

### Prejudice

Petitioner claims that the error and omissions discussed in detail above resulted from Charvet's lack of preparation time. First, only two of those claims—failure to call a carpet fiber expert and failure to present mitigating evidence—can even re-

motely be connected to inadequate preparation time. Plus, Charvet had an additional six weeks during the prosecution's case to prepare the defense. Second, the Court has already found no merit to any of these claims. Finally, having reviewed the entire trial transcripts, the court finds that Charvet did a constitutionally adequate job of representing petitioner. The evidence was such that an additional 3–4 months of preparation would not likely have changed the results.

*Conclusion*

 Petitioner has not demonstrated that the trial court abused its discretion in denying petitioner's implied request for a continuance. The court's actions were neither arbitrary, nor unreasonable. Charvet's decision to take the case without a continuance was not ineffective assistance of counsel since petitioner failed to demonstrate any prejudice from Charvet's representation.

### C. CLAIMS INVOLVING PROSECUTORIAL MISCONDUCT

Issue Seven: THE PROSECUTION COMMITTED OUTRAGEOUS AND CONSTITUTIONALLY IMPERMISSIBLE CONDUCT BY KNOWINGLY USING PERJURED TESTIMONY TO CONVICT PETITIONER

#### PETITIONER'S CLAIM

Petitioner contends that the prosecution knowingly used the perjured testimony of jailhouse informants Jimmy Lee Barnes and Leslie White to convict him. Petitioner bases his perjury allegation against Barnes on a declaration written by Barnes, using a different name, over six years after he testified in the Los Angeles case. Petitioner provides no support for his perjury allegation against White other than that White changed his testimony between his direct examination and his cross examination.

#### ·THE LAW

 If a prosecutor knowingly uses perjured testimony or knowingly fails to disclose that testimony used was false, then a conviction must be set aside if "there is any reasonable likelihood that the false testimony could have affected the jury verdict." *United States v. Endicott*, 869 F.2d 452, 455 (9th Cir.1989), *citing*, *United States v. Bagley*, 473 U.S. 667, 678–80, 105 S.Ct. 3375, 3381–82, 87 L.Ed.2d 481 (1985).

#### DISCUSSION

*Jimmy Lee Barnes*

 The prosecution called Barnes as a witness near the end of the Los Angeles trial. Barnes' direct testimony covered only 6 pages out of approximately 2500 pages of prosecution testimony. [LART 14/4231–4236]. Of significance, Barnes testified that petitioner told him he had sex with little boys then killed them and threw their bodies away. Barnes neither provided names nor details about any murders. This testimony could hardly be deemed crucial to the prosecution's case since four other witnesses—Fraser, Pendleton, Douglas, and Lopez—also testified that Bonin confessed to murdering one or more young males.

Moreover, the jury had ample reason to discredit Barnes' testimony. For example, Barnes connected petitioner with ownership of motorcycles and with "a glass of snot with ice cubes in it." No other witness mentioned either of those subjects. Also, Barnes admitted that he was facing three counts of murder, as well as charges of kidnapping, robbery, and burglary.

Finally, the prosecutor mentioned Barnes' testimony only once in his closing argument. Specifically, the prosecutor recalled that petitioner admitted to Barnes that he did what he was accused of, but that the prosecution would never be able to prove it. [LART 16/4726]. In total, the prosecutor mentioned Barnes in two sentences out of over 180 pages of closing argument.

Having reviewed Barnes' testimony in the context of all of the evidence presented at petitioner's trial, the Court concludes that even if petitioner could prove that Barnes lied, there is no reasonable likeli-

hood that Barnes' testimony affected the jury verdict.

*Leslie White*

▓▓▓▓ White, a jail inmate, was called as a witness by the defense. [LART 15/4373]. White told the jury that Lloyd Carlo Douglas [17] insinuated to him that he had lied at Bonin's preliminary hearing. Douglas, according to White, said he did not want to testify and he was hoping to find an inmate to testify contrary to his testimony at the trial. Later, during cross-examination, White stated that he lied during his direct examination and that he made up the testimony about Douglas because petitioner offered to pay him. [LART 15/4381].

It is clear that White's testimony was collateral to the relevant issue of petitioner's guilt or innocence. White did not link petitioner to any of the crimes for which petitioner was being tried. Charvet, in fact, used White's performance to illustrate for the jury the problems associated with the use of jailhouse informants. [LART 16/4872–4874].

Once again, even if petitioner demonstrated that White perjured himself, the Court finds no reasonable probability that the jury verdicts would have been different without White's testimony.

Issue Eight: PETITIONER WAS DEPRIVED OF DUE PROCESS WHEN THE PROSECUTION INDUCED PETITIONER TO MAKE STATEMENTS WHICH WERE USED TO FURTHER THE PROSECUTION'S CASE

### PETITIONER'S CLAIM

▓▓▓▓ According to petitioner, the prosecution encouraged him to make a statement to allow the prosecution to decide whether to seek the death penalty. After promising not to use petitioner's statements in criminal proceedings against him or anyone else, the prosecution used petitioner's statements to bargain with petitioner's co-defendants, Greg Miley and James Munro. Ulti-

mately, Miley and Munro agreed to plead guilty and testify against petitioner. Petitioner believes that the prosecution's use of his statements to negotiate with Miley and Munro denied him his right to due process and a reliable death verdict.

### BACKGROUND

*The Meeting*

Petitioner, his then-attorney Earl Hanson, the Los Angeles prosecutor Sterling Norris, and several law enforcement officers met for a tape-recorded meeting on December 17, 1980.[18] The tape revealed the following relevant information: At the outset of the meeting, Norris stated that petitioner sought the meeting to convince the prosecution to allow him to plead guilty to first degree murder in exchange for a sentence of life in prison without the possibility of parole. Norris told petitioner that he would consider his offer, but the only promise he could make was that the prosecution would "not use anything you say in evidence against you, anything that you say here tonight in evidence against you in any criminal proceeding unless we can promise you no death penalty." Petitioner and Hanson both said they understood that.

Petitioner questioned what would happen in the other counties if Los Angeles accepted his deal. Norris replied that petitioner's statements would not be used as evidence in any criminal proceeding in any county. While clarifying Norris' statements, Hansen reiterated petitioner's concern that any statements he made not be used in any criminal proceeding or any court in any county. Norris again announced that petitioner's statements would not be used in any criminal proceeding.

After this preliminary discussion, petitioner proceeded to give an extensive account of the murders with which he was involved. In doing so, Bonin implicated two of his co-defendants, Miley and Munro.

---

17. Douglas' testimony is discussed at length under sub-issue (4), above.

18. The Court has listened to the tape-recording of that meeting.

*The Challenge*

Prior to trial, petitioner challenged the circuitous use which the prosecution made of his statements. [LART 6/1788]. The prosecutor, as part of his discovery obligation, gave Miley's attorney and Munro's attorney, a copy of Bonin's statement. [LART 6/1791]. The statement, implicating both Miley and Munro, induced them, at least in part, to plead guilty and testify against Bonin. [LART 6/1832–1835, 1855–1856]. Bonin argued that releasing the tape (or its transcript) to Miley and Munro violated the agreement the prosecutor made at the time petitioner gave his statement.

*The Trial Court Ruling*

The judge interpreted the prosecutor's agreement as meaning that the prosecution would never introduce into evidence the tape, or any part of the tape, of Bonin's statement. [LART 6/1880]. The agreement did not cover the situation that ultimately developed. For that reason, the judge denied Bonin's motion to dismiss the information or suppress the testimony of Miley and Munro on grounds of prosecutorial misconduct.

*The Ruling of the California Supreme Court*

On appeal, the California Supreme Court upheld the trial court's ruling. *See People v. Bonin*, 47 Cal.3d 808, 254 Cal.Rptr. 298, 320, 765 P.2d 460, 482 (1989). After reviewing the evidence, the Supreme Court found that "the prosecution did not use defendant's statements to obtain the agreement of Munro and Miley to testify against him at trial." *Id.*

## DISCUSSION

The Court finds a number of factors to be of importance in resolving this issue. First, petitioner sought the meeting with the prosecution; the prosecution did not approach petitioner. This dispels any notion that the prosecution coerced petitioner to speak. Second, despite petitioner's attempts at equating this situation with immunity, there was no formal immunity offered in this case. Instead, the prosecutor orally promised not to use petitioner's

statement against him as evidence in any criminal proceeding in any court. That was the only limitation placed upon the prosecution's use of petitioner's statement.

Third, the prosecutor resisted turning the taped statement over to the attorneys for Miley and Munro. Initially, the prosecutor believed that petitioner's statement was not discoverable because the statement was inculpatory rather than exculpatory. [LART 6/1868]. An attorney for a co-defendant realized, however, that the statement would be helpful because it showed that the co-defendants were less culpable than petitioner. [LART 6/1869]. The prosecutor went to court to keep from turning over the statement to Munro's attorney. [LART 6/1870]. The court ruled that the statement was discoverable, thus the prosecutor had to make a copy for Munro's attorney. *Id.* Similarly, the court ruled that the prosecutor had to allow Miley's attorney to listen to the taped statement. *Id.*

Fourth, the state court's factual finding that the prosecution did not use petitioner's statements to obtain the testimony of Miley and Munro is entitled to a presumption of correctness. *See* 28 U.S.C. § 2254(d). The court's conclusion has support in the record. In response to questioning from Charvet, Munro testified that Bonin's statement was just one of several reasons why he agreed to plead guilty and testify against Bonin. [LART 6/1835]. Munro also testified that he feared the death penalty [LART 6/1835] and he was concerned because he talked to two informants at the jail and they were prepared to testify against him. [LART 6/1841–1842]. Similarly, Miley merely agreed that one of the reasons he pled guilty was because he knew about Bonin's statements. [LART 6/1856]. Of significance, neither Miley nor Munro read the transcript or listened to the tape of Bonin's statement.

The Court concludes that giving the statement to Miley and Munro did not violate due process. Strictly speaking, the prosecution did not use petitioner's statements in a court proceeding; therefore, no promise was broken. Plea bargaining and

its attendant negotiations are an integral part of the criminal justice system, as are discovery obligations. The prosecution must not be punished, and petitioner rewarded, because the prosecution performed these functions. Any harm accruing to petitioner, and the Court questions what harm there was since Miley and Munro had other reasons for agreeing to a plea bargain, stems from petitioner's attempt to negotiate with the prosecution and not from any unconstitutional action on the part of the prosecution.

**Issue Nine: THE DEATH JUDGMENTS AGAINST PETITIONER ARE CONSTITUTIONALLY UNRELIABLE BECAUSE OF THE PROSECUTOR'S APPEAL TO THE PASSIONS AND EMOTIONS OF THE JURY**

### PETITIONER'S CLAIM

Petitioner alleges that the prosecutor erred in presenting a parent of each victim to identify the victim and provide foundational information, since the defense offered repeatedly to stipulate to the testimony of the parents. By not accepting the proffered stipulations, the prosecution injected unnecessary and prejudicial emotion into the trial. The prosecutor's actions, according to petitioner, violated the Eighth and Fourteenth Amendments and also violated state law requiring the prosecution to accept a defendant's stipulation to foundational facts.

In addition, petitioner contends that the prosecutor compounded his error in the penalty phase by asking the jury to consider the impact of the murders on the families of the victims. The prosecutor's appeal, petitioner argues, violated *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987).

### THE LAW

*Victim Impact Testimony*

In June 1991, after the parties briefed this issue, the United States Supreme Court overruled *Booth* and held that "a State may properly conclude that for the jury to assess meaningfully the defen-

dant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." *Payne v. Tennessee,* — U.S. —, —, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720, 735 (1991). The Court, however, left open the possibility that victim impact evidence could be so prejudicial that its admission would violate the Due Process Clause. *Id.*

The courts which have examined "*Booth* violations" since *Payne* have uniformly agreed that *Payne* precludes the finding of a constitutional violation based solely on the admission of victim impact evidence or related argument by the prosecution. *See e.g. Pierson v. O'Leary,* 959 F.2d 1385, 1390–1391 (7th Cir.1992) (holding that *Payne* overruled *Booth,* therefore there is no merit to a claim that victim impact evidence was improperly admitted under *Booth* ); *Washington v. Murray,* 952 F.2d 1472, 1480 (4th Cir.1991) (noting that even if *Booth* were applied retroactively to cases tried prior to *Booth,* any retrial would be governed by *Payne,* thus vitiating any error attributed to the use of victim impact testimony); *Williams v. Chrans,* 945 F.2d 926, 946–947 (7th Cir.1991) (finding that in light of *Payne* the sole issue for habeas review is whether the use of the victim impact testimony rendered the trial fundamentally unfair); *Horton v. Zant,* 941 F.2d 1449, 1466 (11th Cir.1991) (ruling that constitutional violations under *Booth* are no longer cognizable after *Payne* ).

*Prosecutorial Misconduct*

Prosecutorial error will violate the Constitution only if it "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). "To constitute a due process violation, the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' " *Greer v. Miller,* 483 U.S. 756, 765, 107 S.Ct. 3102, 3109, 97 L.Ed.2d 618 (1987) (citations omitted). The review must focus on the fairness of the trial and not on the culpability of the prosecutor. *See Smith v. Phil-*

*lips,* 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982).

## DISCUSSION

### Victim Impact Testimony

■ The court agrees with the other courts which have addressed the effect of *Payne* on *Booth* claims and concludes that the prosecutor's argument to the penalty phase jury did not violate the Constitution. The prosecutor's statements were a fair assessment of the impact which the cruel and vicious actions of the petitioner had on the families of the young male victims. The severely devastating effect that these murders had on the victims' families is certainly part and parcel of the circumstances of petitioner's crimes, a consideration properly before the penalty phase jury. Moreover, the prosecutor's statements were not unduly prejudicial. The prosecutor's argument did render petitioner's trial fundamentally unfair.

### Prosecutorial Misconduct

■ As for the prosecutor's refusal to stipulate to the testimony of the victims' parents, the Court finds no constitutional error. The parents, in general, identified pictures of their sons and described their sons' physical characteristics. The Court finds that this testimony did not render petitioner's trial fundamentally unfair.

## D. CLAIMS INVOLVING SPECIAL CIRCUMSTANCES

Issue Ten: THE DEATH JUDGMENTS AGAINST PETITIONER ARE CONSTITUTIONALLY UNRELIABLE BECAUSE THEY ARE BASED ON SPECIAL CIRCUMSTANCE FINDINGS WHICH ARE NOT SUPPORTED BY THE EVIDENCE

### PETITIONER'S CLAIM

Petitioner argues that the evidence supporting the special circumstance of murder committed during the commission of a robbery was factually and legally insufficient. Under California law, the robbery special circumstance requires a finding that a defendant killed to advance the independent felonious purpose of robbery. Petitioner submits that even if the evidence was viewed in a light most favorable to the prosecution, no rational trier of fact could find such a felonious purpose in any of the murders for which he was convicted.

## THE LAW

■ Contrary to respondent's repeated assertions, an insufficiency of the evidence claim raises a federal question. *See Jackson v. Virginia,* 443 U.S. 307, 321–324, 99 S.Ct. 2781, 2790–92, 61 L.Ed.2d 560 (1979). This is so because the Due Process Clause prohibits a criminal conviction unless there has been "proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged." *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). In reviewing an insufficiency of the evidence claim brought by a state prisoner, the federal court must ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789 (emphasis in original).

## DISCUSSION

The test set forth in *Jackson* is strict. The Court cannot ask whether it would have reached the same conclusion as the jurors in this case, but rather whether any rational juror could have found the murder-robbery special circumstances.

After ordering supplemental briefing on this issue and carefully reviewing the evidence presented at the trial, the Court concludes that the evidence, albeit extremely circumstantial in several instances, was sufficient to satisfy the legal requirements of the murder-robbery special circumstances.

■ Respondent suggested a method for reviewing this claim which the court finds persuasive. Respondent grouped the killings into three categories: 1) strong evidence of robbery; 2) circumstantial evi-

dence of robbery; and 3) modus operandi evidence of robbery. Munro and Miley testified about the murders of Wells, Miranda, and Macabe. In all three instances, testimony was offered to show that petitioner robbed the victims of their money and/or their clothes prior to killing them. [LART 10/2981–2982, 12/3641, 12/3680]. Based on this testimony, corroborated by testimony that petitioner told others that Miley and Munro testified truthfully, [LART 12/3441–3443, 15/4550], a rational trier of fact could conclude that the elements of murder-robbery special circumstances were established beyond a reasonable doubt.

Regarding the murders of Kendrick, Grabs, Wood, Gatlin, and Murillo, the prosecution presented testimony that the victims were last seen with money and clothes, and were later found without money or clothing. [LART 7/2120–2122, 2133, 7/2180, 2193–2196, 8/2485, 2496–2497, 2512–2513, 8/2448, 2456, 7/2026, 2047]. Based on this evidence, and the "modus operandi" testimony of Miley and Munro, the jury could have inferred that a robbery took place and that petitioner intended to rob his victims.

The evidence to support a robbery of Hyden and Turner is more attenuated since no witness ever testified that the victims were last seen with money. Nevertheless, based on the testimony regarding the other victims, a rational trier of fact could find that petitioner harbored the intent to rob the victims, even if petitioner later discovered that they did not have any money. In any event, both victims were found nude, a clear and consistent sign that petitioner took their clothes with the intent of permanently depriving them of their clothing.

Petitioner argues that these were not murders for financial gain and that the taking of money or clothing was merely an afterthought to the killings. However, nothing in the law, or the facts of this case, precludes a finding that petitioner approached his victims with three separate intentions: to sexually assault, to rob, and to kill. When the evidence presented is viewed in the light most favorable to the

prosecution, the court finds that the jury could have concluded that petitioner harbored an intent to rob each one of his victims and indeed robbed each victim of money, clothing, or both. Accordingly, no relief can be granted on this issue.

Issue Eleven: THE DEATH JUDGMENTS AGAINST PETITIONER ARE CONSTITUTIONALLY UNRELIABLE BECAUSE THEY ARE BASED ON SPECIAL CIRCUMSTANCES WHICH WERE NOT APPLICABLE AGAINST PETITIONER, BUT WERE RETROACTIVELY APPLIED SO AS TO DEPRIVE PETITIONER OF PROTECTIONS EX POST FACTO

### PETITIONER'S CLAIM

Petitioner was tried in 1981. The jury was not instructed on the need to find an intent to kill. In *Carlos v. Superior Court*, 35 Cal.3d 131, 197 Cal.Rptr. 79, 672 P.2d 862 (1983), the California Supreme Court held that the felony-murder special circumstances require the jury to find an intent to kill. In 1987, *Carlos* was partially overruled and the California Supreme Court declared that no finding of intent to kill was necessary for the actual perpetrator. *See People v. Anderson*, 43 Cal.3d 1104, 240 Cal.Rptr. 585, 742 P.2d 1306 (1987). Petitioner argues that the California Supreme Court retroactively and erroneously applied *Anderson* rather than *Carlos* to his case. Such an error, petitioner submits, violated his right to due process and violated the Ex Post Facto Clause of the Constitution.

### THE LAW

For purposes of Ex Post Facto inquiry, this Court must look to the law in effect at the time petitioner committed his offenses. *See Watson v. Estelle*, 886 F.2d 1093, 1096 (9th Cir.1989). This is because the Ex Post Facto Clause is concerned with providing a defendant with fair notice of his punishment at the time he commits a crime. *See Weaver v. Graham*, 450 U.S. 24, 30, 101 S.Ct. 960, 965, 67 L.Ed.2d 17 (1981). Thus, petitioner can establish an ex

post facto violation only if he demonstrates that the retroactive application of *Anderson* subjects him to a more onerous burden than the law in effect at the time his offenses were committed.

## DISCUSSION

Petitioner has raised a claim almost identical to a claim presented in *Hunt v. Vasquez*, 899 F.2d 878 (9th Cir.1990). In *Hunt*, the court ruled the pre-*Carlos* law was identical to the law under *Anderson*. *Id.* at 881. Since petitioner committed his offenses pre-*Carlos*, *Anderson* places him in no worse position then he was at the time he committed his offenses. The Ex Post Facto Clause then, does not entitle petitioner to the benefits of *Carlos*, a ruling made subsequent to his trial and later reversed.

*Hunt* is consistent with another Ninth Circuit case holding that the retroactive application of *Anderson* does not violate due process. *See Hughes v. Borg*, 898 F.2d 695, 705 (9th Cir.1990). The *Hughes* court found that it was foreseeable, in the pre-*Carlos* years, that intent to kill was not a requirement for a felony murder special circumstance conviction.

Following *Hunt* and *Hughes*, the Court concludes that the application of *Anderson* to petitioner's case neither violates due process, nor offends the Ex Post Facto Clause.

Issue Twelve: THE JURY WAS ALLOWED TO CONSIDER TEN MULTIPLE MURDER SPECIAL CIRCUMSTANCES AS TEN SEPARATE AGGRAVATING FACTORS

### PETITIONER'S CLAIM

■ Petitioner contends that the aggravating factors in his case were artificially inflated by the erroneous inclusion of ten multiple murder special circumstances.

## BACKGROUND

Petitioner's jury found ten multiple murder special circumstances to be true, one for each murder conviction. At the penalty phase, the jury was instructed to consider the circumstances of the crimes for which petitioner was convicted, as well as any

special circumstances found to be true. On appeal, the California Supreme Court vacated nine of the multiple murder special circumstances, holding that it was error to charge more than one multiple murder special circumstances. *See People v. Bonin*, 47 Cal.3d 808, 254 Cal.Rptr. 298, 324, 765 P.2d 460, 486 (1989).

## DISCUSSION

The Court finds that any error in the inclusion of the excess special circumstances was harmless beyond a reasonable doubt. Special circumstances serve to narrow the class of murderers eligible for a death sentence. In that sense, no harm occurred. The jury properly found petitioner to be death penalty eligible because he committed multiple murders. That finding was correct regardless of the number of special circumstances actually charged.

Beyond that, there is no reason to believe that the jury decided on a death sentence because of the number of special circumstances found to be true. Once the trial reached a penalty phase, the special circumstances served merely as a label for the circumstances of the crimes—that petitioner killed ten young men—a proper consideration for the penalty phase jury. There is nothing in the record that supports an argument that the jury mechanically counted up the special circumstances and then imposed the death penalty on that basis. *See Harris v. Pulley*, 692 F.2d 1189, 1203 (9th Cir.1982), *reversed on other grounds*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Accordingly, this issue does not warrant habeas relief.

## E. OTHER ISSUES

Issue Thirteen: THE DEATH JUDGMENTS AGAINST PETITIONER ARE CONSTITUTIONALLY UNRELIABLE BECAUSE PETITIONER'S RIGHTS AGAINST SELF-INCRIMINATION AND TO TESTIFY IN HIS OWN DEFENSE WERE UNCONSTITUTIONALLY COMPROMISED

### PETITIONER'S CLAIM

■ Petitioner finds error in the prosecution's use of the four not-yet-adjudicated

Orange County murders as evidence at the penalty phase. The use of the four Orange County murders put two of petitioner's fundamental rights in conflict: his right to testify in his own defense at the penalty phase and his right not to incriminate himself regarding his pending Orange County trial.

## THE LAW

 The Supreme Court has recognized that tensions can exist between constitutional rights:

> The criminal process, like the rest of the legal system, is replete with situations requiring "the making of difficult judgments" as to which course to follow. [Citation omitted]. Although a defendant may have a right, even of constitutional dimension, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose.

*McGautha v. California,* 402 U.S. 183, 213, 91 S.Ct. 1454, 1470, 28 L.Ed.2d 711 (1971). In such a situation, the key question is whether the need to select one right over another appreciably impairs the policies behind the rights. *Id.*

The situation in *McGautha* closely parallels petitioner's situation. In *McGautha,* the defendant was tried for a capital offense under a unitary trial system. In other words, the jury determined guilt and punishment in one trial, rather than a bifurcated guilt and penalty phase. The defendant argued that the unitary system violated his right to due process because he could only remain silent on guilt-related issues if he gave up his right to testify regarding his punishment. Conversely, if he exercised his right to testify regarding punishment, he would forfeit his right not to incriminate himself.

The Court analyzed the defendant's claim by determining the impact of the unitary trial system on the right to testify and on the right not to incriminate oneself. The Court drew two conclusions. First, "the

policies of the privilege against self-incrimination are not offended when a defendant in a capital case yields to the pressure to testify on the issue of punishment at the risk of damaging his case on guilt." *Id.* at 217, 91 S.Ct. at 1472. Second, the state was not "required to provide an opportunity for petitioner to speak to the jury free from any adverse consequences on the issue of guilt." *Id.* at 220, 91 S.Ct. at 1474.

## DISCUSSION

Petitioner's predicament was really no different than the one faced by the defendant in *McGautha.* Such dilemmas, while requiring tough choices, comport with the Constitution.

Issue Fourteen: THE DEATH JUDGMENTS AGAINST PETITIONER ARE CONSTITUTIONALLY UNRELIABLE BECAUSE THEY ARE BASED ON ERRONEOUSLY ADMITTED EVIDENCE

### PETITIONER'S CLAIM

 Petitioner contends that the trial court erroneously allowed into evidence testimony about an experiment conducted by a criminalist. The experiment involved trying to prove that Wells was strangled by a t-shirt. The criminalist photographed a silicone rubber cast of Wells' neck. He then compared that photo to a photograph of a silicone rubber cast made of his arm after he twisted a t-shirt around it. The criminalist told the jury that the two photographs were similar, thus supporting Munro's testimony that petitioner killed Wells by strangling him with a t-shirt.[19] Petitioner submits that the admission of this unreliable testimony violated his right to due process.

### THE LAW

 Federal habeas corpus relief is not available for state law errors arising from the improper admission of evidence. *Estelle v. McGuire,* —— U.S. ——, ——, 112

---

**19.** Prior to the testimony of the criminalist, Charvet asked for a hearing outside the presence of the jury to determine the validity of the experiment. The court denied Charvet's request. [LART 3809–3810].

S.Ct. 475, 481, 116 L.Ed.2d 385, 396 (1991). Indeed, "failure to comply with the state's rules of evidence is neither a necessary nor a sufficient basis for granting habeas relief." *Jammal v. Van De Kamp,* 926 F.2d 918, 919 (9th Cir.1991).

Thus, the ruling by the California Supreme Court[20] that the experimental evidence should not have been admitted because there was an inadequate foundation is of no importance to the federal court unless the admission of the evidence violated due process. *Id.* "Due process requires that criminal prosecutions 'comport with prevailing notions of fundamental fairness.'" *Featherstone v. Estelle,* 948 F.2d 1497, 1504 (9th Cir.1991), *quoting, California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984). Accordingly, petitioner can obtain relief only if the admission of the testimony about the t-shirt experiment rendered his trial arbitrary and fundamentally unfair. *See Jammal,* 926 F.2d at 920 (citation omitted).

### DISCUSSION

Munro testified that petitioner murdered Wells by strangling him with a t-shirt. From this fact, it is easy to infer that the prosecution introduced the t-shirt testimony to bolster the credibility of Munro. The question the Court must answer is whether the "corroboration" of Munro's story affected the outcome of petitioner's trial.

The jury was provided with plenty of examples of Munro's ability to lie and to manipulate. Notwithstanding this evidence, the jury convicted petitioner. It would strain the imagination to believe that the jury ultimately accepted Munro's version of the murder because of the criminalist's testimony about the similarity of the photographs.

This view finds support in Charvet's thorough cross-examination of the criminalist. Upon questioning by Charvet, the criminalist admitted that his experiment was conducted on an arm rather than a neck, that another type of cloth might leave a similar mark, that he had never conducted such an experiment before, and

he had never heard of anyone in the scientific community performing such an experiment. [LART 13/3816]. While the testimony undoubtedly helped the prosecution to argue its case, the admission of the testimony did not render the trial fundamentally unfair.

Issue Fifteen: THE DEATH JUDGMENTS AGAINST PETITIONER ARE CONSTITUTIONALLY UNRELIABLE BECAUSE THE TRIAL COURT FAILED TO INSTRUCT THE JURY REGARDING THE UNRELIABILITY OF INFORMANT TESTIMONY

### PETITIONER'S CLAIM

 Petitioner maintains that the trial court violated his right to due process and a reliable death verdict by failing to instruct the jury sua sponte to view informant testimony with caution. Petitioner describes the testimony of informants Douglas and Barnes as "crucial for the prosecution." Therefore, petitioner contends, the omission of the informant instruction requires a reversal of petitioner's convictions.

### THE LAW

 The failure of a trial court to give an instruction *sua sponte* about the unreliability of informant testimony does not necessarily constitute plain error requiring a reversal. *United States v. Bosch,* 914 F.2d 1239, 1247 (9th Cir.1990). The need for the instruction must be analyzed in light of the circumstances of the case. For example, failure to give an informant instruction might be error when the informant's testimony is uncorroborated and also is critical and suspect. *Id., citing, United States v. Martin,* 489 F.2d 674, 677 n. 3 (9th Cir. 1973), *cert. denied,* 417 U.S. 948, 94 S.Ct. 3073, 41 L.Ed.2d 668 (1974). On the other hand, the presence of general credibility instructions, as well as credibility arguments made by counsel might make the informant instruction unnecessary. *Bosch,* 914 F.2d at 1248.

### DISCUSSION

The lack of an informant instruction in this case was not error. Neither the testi-

---

**20.** *See People v. Bonin,* 47 Cal.3d 808, 254 Cal. Rptr. 298, 321, 765 P.2d 460, 482 (1989).

mony of Douglas, nor the testimony of Barnes was critical to petitioner's convictions. As discussed above, key parts of Douglas' testimony lacked credibility even without an instruction. In addition to testifying about engaging in oral sex with petitioner in prison, Douglas told the jury that petitioner mutilated a number of his victims. The testimony about oral sex was irrelevant to petitioner's convictions. The testimony about the mutilations was apparently rejected by the jury since petitioner was acquitted of the only murder which involved the type of mutilation described by Douglas. Finally, Douglas' testimony about petitioner's admissions were corroborated by Lopez.

Similarly, as discussed above, Barnes' testimony was not necessary for petitioner's convictions. Though he testified that petitioner admitted killing little boys, Barnes provided no names and no details. Four other witnesses testified that petitioner admitted killing one or more boys; therefore, Barnes' testimony was neither critical, nor uncorroborated. In addition, both Barnes and Douglas admitted to the jury that they were facing felony charges.

Moreover, the court gave very detailed general credibility instructions, including one instruction that evidence of defendant's oral confession or oral admission should be viewed with caution. [LART 17/5008–7—5008–9, 5008–14].

When the limited testimony of Barnes and Douglas is considered along with the credibility instructions given by the trial court, the Court concludes the trial court's failure to give an informant instruction *sua sponte* did not violate any of petitioner's constitutional rights.

Issue Sixteen: THE JURY WAS MIS-LEAD ABOUT ITS DISCRETION AND SENTENCING RESPONSIBILITY

PETITIONER'S CLAIM

Petitioner claims error with the jury instruction that said "if you conclude that

the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death." Petitioner suggests that the instruction may have caused the jurors to believe that they had to vote for death even if they did not personally feel that death was the appropriate punishment.

DISCUSSION

The United States Supreme Court has found the type of jury instruction cited by petitioner to be constitutionally sound. *See Boyde v. California*, 494 U.S. 370, 376, 110 S.Ct. 1190, 1195, 108 L.Ed.2d 316 (1990) (upholding the identical instruction because the instruction still allowed each juror to make an individualized assessment of the defendant); *Blystone v. Pennsylvania*, 494 U.S. 299, 305, 110 S.Ct. 1078, 1082, 108 L.Ed.2d 255 (1990) (upholding a similar instruction because the instruction did not automatically impose death based on the type of offense, but rather required a weighing of aggravating and mitigating circumstances).

Issue Seventeen: THE JURY WAS MIS-LED ABOUT LIMITATIONS UPON ITS CONSIDERATION OF MITIGATING EVIDENCE

PETITIONER'S CLAIM

▇▇▇ Petitioner finds error with the eleven statutory factors given to the jury for use in considering the appropriate punishment. Petitioner contends that the eleven factors restricted the jury's consideration and may have caused the jurors to disregard some of the mitigating evidence offered by petitioner. Specifically, petitioner believes that the catch-all factor, factor (k)[21] concerned only present and prior criminal activity, and not background and character evidence.

DISCUSSION

This same argument was considered and rejected by the United States Supreme

---

**21.** Factor (k) allows the jury to consider "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

Court in *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). The Court found there to be no reasonable likelihood that a jury would interpret factor (k)[22] in a way that precluded consideration of mitigating evidence unrelated to the crime. *Id.* at 381, 110 S.Ct. at 1198. Accordingly, this claim is without merit.

Issue Eighteen: THE JURY WAS AL-LOWED TO CONSIDER THE AB-SENCE OF MITIGATION AS AG-GRAVATION

PETITIONER'S CLAIM

■ Petitioner argues that the trial court should have deleted the inapplicable statutory factors from the list read to the jury. By failing to do so, the court allowed the jury to consider the absence of evidence on a mitigating factor to be a factor in aggravation.

DISCUSSION

A fair death penalty system allows juries to know which factors the state finds relevant in making a sentencing decision. *See Gregg v. Georgia,* 428 U.S. 153, 192, 96 S.Ct. 2909, 2934, 49 L.Ed.2d 859 (1976). Therefore, the California Supreme Court has long encouraged trial courts to provide jurors with all of the statutory factors deemed relevant by the State so that the jurors can exercise discretion within the proper framework. *See e.g. People v. Miranda,* 44 Cal.3d 57, 241 Cal.Rptr. 594, 624, 744 P.2d 1127, 1157 (1987); *People v. Ghent,* 43 Cal.3d 739, 239 Cal.Rptr. 82, 107, 739 P.2d 1250, 1275 (1987). Obviously, if a trial court were to delete those factors which the court believed to be inapplicable, the jury would be deprived of this necessary information.

For this reason, the Court finds that the failure to delete inapplicable factors does not violate the Constitution, especially when, as here, the jury was instructed to consider only those factors that were applicable. *Accord Campbell v. Kincheloe,* 829 F.2d 1453, 1458–1459 (9th Cir.1987) (finding

22. The factor (k) instruction at issue in *Boyde* was identical to the factor (k) instruction given

that instructing on possible mitigating factors for which the defendant has not presented any evidence does not violate the Constitution), *cert. denied,* 488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988).

Issue Nineteen: THE JURY WAS AL-LOWED TO CONSIDER AGE AS AN AGGRAVATING FACTOR

PETITIONER'S CLAIM

■ Petitioner maintains that it was constitutionally impermissible to use his age as a statutory factor to be considered by the jury. The error, petitioner argues, is that the instructions allowed the jury to find his age to be an aggravating factor rather than a mitigating or neutral factor.

DISCUSSION

This argument is really just a sub-issue of issue 17, above. For the reasons set forth under issue 17, the Court rejects this claim. Moreover, even if the jury mistakenly found petitioner's age to be aggravating, there is no reasonable likelihood that with evidence that Bonin killed 14 young men and boys and sexually molested a number of other boys, the jury voted for death because Bonin was 32–33 years old at the time of the murders. In other words, petitioner's age was inconsequential at best.

Issue Twenty: THE JURY WAS AL-LOWED TO CONSIDER THE CIR-CUMSTANCES OF THE CRIMES AS TWO SEPARATE AGGRAVA-TING FACTORS

PETITIONER'S CLAIM

■ Petitioner alleges that the aggravating factors in his case were artificially inflated because the jury was allowed to consider the circumstances of the crimes under both factor (a) and factor (b).

BACKGROUND

The court instructed the jury as follows:

in petitioner's case.

You shall consider, take into account, and be guided by the following factors, if applicable:

(a) the circumstances of the crime of which petitioner was convicted in the present proceeding and the existence of any special circumstances found to be true;

(b) the presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence; ...

[LART 18/5526–1].

## THE LAW

■ When a state court conviction is collaterally attacked on the basis of an erroneous jury instruction, the question to be answered is "whether the ailing instruction so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). In making this assessment, the reviewing court must remember that a single jury instruction is not to be viewed in isolation, but rather as part of the entire trial, which includes all of the testimony, exhibits, arguments, and instructions. *See id.*

## DISCUSSION

The court notes that the instruction in question, statutory factor (b), was not erroneous, but rather vague. Correctly interpreted, factor (b) informs the jury that *other* instances of a defendant's criminal activity involving the actual or potential use of force or violence are proper consideration at the penalty phase. Indeed, in accordance with subsequent rulings from the California Supreme Court, this instruction has been changed to insure clarity. The new instruction reads:

You shall consider, take into account, and be guided by the following factors, if applicable:

\* \* \* \* \* \*

(b) The presence or absence of criminal activity by the defendant, *other than the crime[s] for which the defendant has been tried in the present proceedings,*

which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

California Jury Instructions, Criminal (5th Ed.1988) (emphasis added).

When viewed in the context of the entire penalty phase, the vaguely worded instruction did not so infect petitioner's trial as to violate due process. The combination of the penalty phase evidence, the arguments of counsel, and the entire penalty phase instructions led to one reasonable conclusion: the jury should weigh the circumstances of the crimes, as well as the evidence of other criminal acts perpetrated by petitioner against the mitigating evidence presented by petitioner. The record does not support an argument that the jury mechanically doubled the weight of the circumstances of the crime due to a possible technical reading of statutory factor (b). The Court declines to find a constitutional violation with the wording of statutory factor (b) as used in petitioner's trial.

Issue Twenty-one: FAILURE TO REQUIRE FINDING BEYOND A REASONABLE DOUBT THAT AGGRAVATING CIRCUMSTANCES OUTWEIGH MITIGATING

## PETITIONER'S CLAIM

■ Petitioner believes that the jurors should have been instructed that they could impose death only if they were convinced beyond a reasonable doubt that aggravating circumstances outweighed mitigating, and if they personally believed death to be the appropriate punishment. Petitioner notes that in California, proof beyond a reasonable doubt is required to commit a narcotics offender or mentally disordered sex offender and to appoint a conservator, therefore, that quanta of proof should be required when a defendant's life is at stake. Failure to give this instruction denied petitioner due process, equal protection, and a reliable death verdict.

## THE LAW

[Petitioner raised this identical claim in his Orange County case. The Court adopts the reasoning used in that case. *See Bo-*

*nin v. Vasquez,* 794 F.Supp. 957, 984 (C.D.Cal.1992). For convenience, the Court repeats that discussion, below.]

A number of courts have examined this issue. A decade ago, in rejecting the contention that the Constitution requires the sentencer to find that aggravating factors outweigh mitigating factors beyond a reasonable doubt, the Ninth Circuit observed:

> The United States Supreme Court has never stated that a beyond-a-reasonable-doubt standard is required when determining whether a death penalty should be imposed.... If the Supreme Court had intended for the burden in death-penalty cases to vary from the standard burden in all other criminal sentencing, it would have said so in one of the many modern cases dealing with the death penalty.

*Harris v. Pulley,* 692 F.2d 1189, 1195 (9th Cir.1982), *reversed on other grounds,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).[23]

Shortly thereafter, in *Zant v. Stephens,* 462 U.S. 862, 874, 103 S.Ct. 2733, 2741, 77 L.Ed.2d 235 (1983), the Court noted, without disapproval, that in Georgia, the jury is not instructed to balance aggravating and mitigating factors under any special standard. Indeed, the Court went on to state, "the Constitution does not require a State to adopt specific standards for instructing the jury in its consideration of aggravating and mitigating circumstances...." *Id.,* 462 U.S. at 890, 103 S.Ct. at 2750.

Similarly, the Eleventh Circuit, sitting *en banc,* has rejected this same argument. *See Ford v. Strickland,* 696 F.2d 804, 817–818 (11th Cir.) (*en banc*), *cert. denied,* 464 U.S. 865, 104 S.Ct. 201, 78 L.Ed.2d 176 (1983). The *Ford* court recognized that due process protects a defendant from "conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Id.* at 818, *quoting, In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073,

25 L.Ed.2d 368 (1970). The requirement that aggravating factors outweigh mitigating factors for a death sentence to be imposed is not an element of the crime of capital murder, however. *Id.* Therefore, due process does not come into play in weighing factors presented at a sentencing hearing held after conviction. *Ford,* 696 F.2d at 818.

In addition, the *Ford* court cautioned against confusing the existence of a fact with the relative weighing of facts. The existence of a fact can be demonstrated at different standards of proof. *Id.* The weighing of factors, however, "is not susceptible to proof by either party." *Id.*

## DISCUSSION

The Court adopts the reasoning and conclusions of the *Ford* court and holds that the Constitution does not require the instruction suggested by petitioner.

As for petitioner's equal protection argument, petitioner has failed to recognize a fundamental tenet of such analysis, namely, that the comparison must be made between similarly situated entities. Instead, petitioner has mixed apples and oranges. A convicted capital defendant awaiting sentencing is *not* similarly situated to a person being considered for commitment as a narcotics addict or a mentally disordered sex offender or a person being judged for a conservatorship. The Fourteenth Amendment does not require disparate groups to be treated the same. Accordingly, petitioner's claim based on equal protection is without merit.

**Issue Twenty-two: THE BRIGGS CAPITAL SENTENCING STATUTE IS UNCONSTITUTIONAL**

### PETITIONER'S CLAIM

Petitioner submits that the California death penalty statute fails to meet the minimum requirements of the Eighth and Fourteenth Amendments because it does not provide for: 1) specific and objective

**23.** Despite the reversal, the United States Supreme Court noted, without disapproving, that the Ninth Circuit found there was no constitutional requirement that the appropriateness of the death sentence be established beyond a reasonable doubt. *Pulley v. Harris,* 465 U.S. 37, 41 n. 4, 104 S.Ct. 871, 874 n. 4, 79 L.Ed.2d 29 (1984).

enumeration of aggravating and mitigating factors to guide the jury; 2) exclusion of nonstatutory unspecified aggravating factors as a basis for the death penalty; 3) a requirement that the prosecution prove the existence of any aggravating factors beyond a reasonable doubt; 4) a requirement of jury unanimity regarding the presence of any aggravating factors; 5) comparative appellate review to prevent inconsistency; and 6) a requirement of written findings on any aggravating factors.

### THE LAW

[Petitioner raised this identical claim in his Orange County case. The Court adopts the reasoning used in that case. *See Bonin v. Vasquez,* 794 F.Supp. 957, 987 (C.D.Cal.1992). The Court repeats that discussion, below.]

*Constitutionality of the 1978 Death Penalty Statute*

The United States Supreme Court has approved of California's death penalty scheme. *See California v. Brown,* 479 U.S. 538, 540 n. *, 107 S.Ct. 837, 838 n. *, 93 L.Ed.2d 934 (1987).

*Enumerating the Aggravating and Mitigating Factors*

Petitioner does not explain what this requirement means. In any event, the Court finds that the statutory factors set forth in CALJIC 8.84.1 are constitutionally sound. *See Boyde,* 494 U.S. 370, 110 S.Ct. 1190.

*Proving Aggravating Factors Beyond a Reasonable Doubt*

Neither the United States Supreme Court, nor the Ninth Circuit has specified the burden of proof to be applied to aggravating factors in a death penalty situation. In fact, the Ninth Circuit recently declined to decide whether federal constitutional law requires aggravating circumstances to be established beyond a reasonable doubt. *See Clark v. Ricketts,* 958 F.2d 851, 860 n. 6 (9th Cir.1992).[24]

An analogy can be drawn, however, to the burden of proof needed to establish enhancing factors for sentencing under the

Federal Sentencing Guidelines. In a recent *en banc* decision, the Ninth Circuit held that due process does not require anything more than a preponderance of the evidence standard for establishing enhancing factors. *See United States v. Restrepo,* 946 F.2d 654 (9th Cir.1991) (*en banc*), *cert. denied,* —— U.S. ——, 112 S.Ct. 1564, 118 L.Ed.2d 211 (1992). In so holding, the court noted that a sentencing factor is not an element of the offense requiring a heightened standard of proof. *Id.* at 656. The court further reasoned that the fully adversarial factfinding process and the right to appeal sentence findings adequately protect a convicted defendant's interests without requiring a higher standard of proof. *Id.* at 658.

■ The same reasoning applies in a death penalty case. An aggravating factor in the penalty phase of a capital case is not an element of the offense, but rather "a sentencing factor that comes into play only after the defendant has been found guilty." *Hildwin v. Florida,* 490 U.S. 638, 640, 109 S.Ct. 2055, 2057, 104 L.Ed.2d 728 (1989), *quoting, McMillan v. Pennsylvania,* 477 U.S. 79, 86, 106 S.Ct. 2411, 2417, 91 L.Ed.2d 67 (1986). In addition, the capital sentencing scheme in California provides numerous protections for the capital defendant. For example, the penalty phase is a fully adversarial proceeding. Moreover, a defendant sentenced to death has an automatic modification of sentence motion before the trial court, as well as an automatic appeal to the California Supreme Court.

In a similar vein, the court in *Restrepo* observed that the liberty interests involved at trial differ markedly from the liberty interests at sentencing. Once convicted, a defendant's interest is confined to a proper application of the statutory guidelines, nothing more. *Id.* Once again, the same argument applies to the penalty phase of a capital case.

Adopting the reasoning of *Restrepo,* this Court finds that the Constitution does not

---

**24.** The court did not reach the issue because the state supreme court found that the aggravating circumstances had been established beyond a reasonable doubt. *Clark,* 958 F.2d at 860 n. 6.

require that aggravating factors be proved beyond a reasonable doubt.

*Unanimity*

■ Petitioner further argues that the California death penalty statute is unconstitutional because it does not require the jury to find aggravating factors with unanimity. While there is much case law concerning the unconstitutionality of requiring unanimity for finding mitigating factors,[25] there is a dearth of cases considering a unanimity requirement for aggravating factors.

One court correctly noted that the United States Supreme Court has never embraced such a requirement:

> However, the Virginia Supreme Court has held that in imposing the death penalty, following a capital murder conviction, the jury's verdict is not required to be unanimous as to the aggravating factors relied upon. [Citation omitted.] Nor does the United States Constitution require that the jury be unanimous. The Supreme Court has only held that the capital sentencing proceeding is to meet some of the requirements of a criminal trial, such as the right to counsel. [Citation omitted.] It has not held jury unanimity on the sub-determination of aggravation is a constitutional requirement.

*Briley v. Bass,* 584 F.Supp. 807, 819 (E.D.Va.), *aff'd,* 742 F.2d 155 (4th Cir.), *cert. denied,* 469 U.S. 893, 105 S.Ct. 270, 83 L.Ed.2d 206 (1984).

The Court holds that the Constitution does not require jury unanimity on aggravating factors. Unanimity plays a role in the final determination—whether aggravating factors outweigh mitigating factors. Beyond that, each juror need not agree what factors are aggravating. Constitutional concerns are met when each juror agrees that the aggravation, in toto, outweighs the mitigation in toto, or vice-versa.

*Comparative appellate review*

In *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), the Court thoroughly evaluated the use of comparative sentence reviews in capital cases. Using the Eighth Amendment as its springboard, the Court ruled that the Constitution does not require proportionality review in capital cases, provided the capital sentencing scheme provides sufficient procedural safeguards to ensure that the sentence is neither arbitrary nor capricious. *Harris,* 465 U.S. at 50–51, 104 S.Ct. at 879. After analyzing the 1977 California death penalty statute,[26] the Court concluded that the statute provided enough checks on arbitrariness that proportionality review was not necessary for the statute to pass constitutional muster. *Id.* at 51, 104 S.Ct. at 880.

*Requiring Written Findings*

■ The Ninth Circuit has analyzed, and rejected, this contention. *See Harris v. Pulley,* 692 F.2d 1189, 1195 (9th Cir. 1982), *reversed on other grounds,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). In *Harris,* the court found that the constitutional requirements set forth in *Gregg v. Georgia,* 428 U.S. 153, 192, 96 S.Ct. 2909, 2934, 49 L.Ed.2d 859 (1976), and *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), are satisfied by the requirement that the trial judge articulate his or her findings as part of the automatic motion to modify sentence. *Id.*

Pursuant to California Penal Code § 190.4(e), when the jury has recommended a death penalty, the trial judge must "review the evidence ... and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evi-

---

**25.** *See e.g. Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) ("We conclude there is a substantial probability that reasonable jurors ... may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance.... The possibility that a single juror could block such consideration, and consequently require the jury to impose the death penalty, is one we dare not risk").

**26.** Petitioner was sentenced under the 1978 California death penalty statute. However, the *Harris* court noted that the 1977 and 1978 provisions are substantially similar and that, for the most part, what was said in the opinion applied equally to the 1978 statute.

dence presented. The judge shall state on the records the reasons for his findings." Accordingly, the judge's determinations on the record provide ample basis for appellate review. *Id.* at 1196. *See also Andrews v. Shulsen,* 802 F.2d 1256, 1261 (10th Cir.1986), *cert. denied,* 485 U.S. 919, 108 S.Ct. 1091, 99 L.Ed.2d 253 (1988) ("A jury need not make specific written findings of aggravating and mitigating circumstances for purposes of review if the sentencing mechanism is otherwise valid.").

Since the purpose behind a written finding requirement is to have an adequate record for appellate review, California's death penalty statute is not unconstitutional for requiring the judge, not the jury, to make the record for appellate review.

### DISCUSSION

Petitioner has not established any constitutional infirmity with California's death penalty statute. The Court concludes that the Constitution does not require the addition of any of the procedures suggested by petitioner.

**Issue Twenty–Three:** DENIAL OF DUE PROCESS ON APPEAL AND FAILURE TO HOLD EVIDENTIARY HEARING

#### PETITIONER'S CLAIM

 Petitioner asserts that the California Constitution requires the California Supreme Court to issue written findings when it determines "causes." Petitioner further asserts that his habeas claims were "causes" and thus, he had an state-created interest, protected by the Due Process Clause, to have his habeas claims decided with written findings. In addition, petitioner argues that the California Supreme Court was obligated to hold an evidentiary hearing to resolve factual issues raised in his habeas petitions.

#### THE LAW

[Petitioner raised this identical claim in his Orange County case. The Court adopts the reasoning used in that case. *See Bonin v. Vasquez,* 794 F.Supp. 957, 989 (C.D.Cal.1992). The Court repeats that discussion, below.]

"[A] petition alleging errors in the state post-conviction review process is not addressable through habeas corpus proceedings." *Franzen v. Brinkman,* 877 F.2d 26 (9th Cir.), *cert. denied,* 493 U.S. 1012, 110 S.Ct. 574, 107 L.Ed.2d 569 (1989). The Franzen decision flows from the distinction made between direct appeals and collateral reviews. *See Pennsylvania v. Finley,* 481 U.S. 551, 556–557, 107 S.Ct. 1990, 1994, 95 L.Ed.2d 539 (1987).

### DISCUSSION

This issue, challenging as it does California's state habeas process, is not cognizable on federal habeas corpus.

**Issue Twenty–Four:** CUMULATIVE ERROR

#### PETITIONER'S CLAIM

 Petitioner argues that the errors set forth in grounds one through twenty-three above, when viewed in the aggregate, rendered his trial and sentence unreliable.

### DISCUSSION

Petitioner's trial was not error-free; no trial ever is. *See e.g. United States v. Hasting,* 461 U.S. 499, 509, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983) ("[G]iven the myriad safeguards provided to assure a fair trial, and taking into account the reality of human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and [the] Constitution does not guarantee such a trial."). Nevertheless, having reviewed the entire state record, the Court is convinced that petitioner received a fundamentally fair trial.

### IV. CONCLUSION

For all of the reasons set forth above, the Court DENIES this petition for writ of habeas corpus.

This opinion and order constitute a final disposition of this petition by the Court. Accordingly, the stay of execution previously granted by the Court is now vacated. If petitioner applies for a certificate of

probable cause and the certificate is granted, the Court will grant another stay of execution which will remain in effect until the Court of Appeals acts upon the appeal or the order to stay the execution. *See* Local Rule 26.8.7(f).

IT IS SO ORDERED.